# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00529-CV

---

**Peter Leavitt, Appellant**

**v.**

**McLane Company, Inc., Appellee**

---

### FROM THE 169TH DISTRICT COURT OF BELL COUNTY
### NO. 282,147-C, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

McLane Company, Inc. sued its former employee Peter Leavitt for breaches of a separation agreement, a settlement agreement, and an agreed injunction after Leavitt performed consulting work for McLane's customers. The trial court rendered judgment on the jury's verdict, awarding McLane over $1.6 million in damages. Leavitt appeals from the judgment, complaining that the trial court erred in directing a verdict on McLane's civil-contempt claim, not determining that McLane's claims were barred by res judicata, improperly commenting on the weight of the evidence, admitting evidence of a prior contempt proceeding, and rendering judgment on the jury's verdict when it was not supported by legally or factually sufficient evidence. For the following reasons, we will affirm the trial court's judgment.

## BACKGROUND[1]

The genesis of this dispute lies in a "Release and Separation Agreement" (the Separation Agreement) that Leavitt executed in connection with McLane's termination of his employment in late 2007. Leavitt had worked for McLane, a wholesale grocery distributor, for over a decade and was a senior executive when terminated. The Separation Agreement prohibited Leavitt from "tak[ing] any action reasonably likely to be harmful to the business or affairs of McLane" and required him to keep McLane's proprietary information confidential. While employed with McLane, Leavitt had negotiated a "Distribution Service Agreement" (DSA) between McLane and its customer Circle K Stores, Inc. The DSA authorized Circle K to perform audits to determine whether McLane was charging it correctly for the products and services it provided.

After his termination from McLane's employ, Leavitt signed an agreement with Circle K to advise it in conducting an audit pursuant to the DSA and engaged other former McLane employees to assist. Shortly after engaging Leavitt, Circle K sent McLane a letter stating that it had contracted the services of SVG Advisors to assist with an audit but did not disclose Leavitt's involvement. When McLane later discovered Leavitt's involvement, it sued Leavitt[2] for breach of the Separation Agreement and misappropriation of trade secrets. In January 2012, Leavitt and McLane settled the lawsuit and presented a Settlement Agreement to the trial court, which rendered an Agreed Final Judgment and Injunction (Agreed Injunction)

---

[1] Except as otherwise noted, the facts in this section are derived from unobjected-to evidence admitted at trial and the clerk's record.

[2] McLane also sued two other former employees, but those individuals are not parties to this appeal.

thereon. The Agreed Injunction provides, "This Agreed Final Judgment and Injunction is also a contract between [McLane] and [Leavitt]."

In April 2012, Leavitt communicated with the same Circle K executive with whom he had negotiated the DSA and advised him that Circle K should pursue its audit "claim" against McLane; at this juncture no audit had yet occurred because Circle K and McLane could not agree about the audit procedures and parameters, and communication between Circle K and McLane regarding the audit had been on hiatus. About seven weeks after Leavitt sent his email, Circle K contacted McLane to renew its audit request. When McLane refused to allow Circle K to conduct an audit, Circle K initiated an arbitration proceeding against McLane before the American Arbitration Association (AAA) pursuant to the DSA's dispute-resolution provision, alleging that McLane breached the DSA by refusing to allow it to perform the audit and seeking a declaration of its audit rights. The Circle K arbitration ensued for three years, and McLane ultimately prevailed on Circle K's audit claim but incurred over $2,400,000 in attorney's fees in the proceeding.

Through discovery during the arbitration process, McLane learned about Leavitt's April 2012 communication with the Circle K executive and on January 29, 2015, filed a verified motion to hold Leavitt in contempt for breaching the Agreed Injunction.[3] After an evidentiary hearing, at which Leavitt testified, the trial court issued an order holding Leavitt in criminal contempt and finding "beyond a reasonable doubt" that Leavitt was "guilty of wrongfully and intentionally violating" the Agreed Injunction by sending an April 2012 email to the Circle K executive "advising of [Leavitt's] belief that there was a reason to pursue Circle K's claim

---

[3] At trial, Leavitt objected to evidence related to the contempt proceeding, and he challenges the admission of such evidence on appeal.

3

against McLane." The trial court sentenced Leavitt to incarceration in the Bell County jail for twenty days, suspended for twelve months conditioned upon his strict compliance, beginning April 1, 2015, with the Agreed Injunction.

On January 6, 2016, McLane filed this lawsuit against Leavitt alleging breaches of the Separation Agreement, Settlement Agreement, and Agreed Injunction. McLane also asserted a claim against Leavitt for "civil contempt." The case was tried to a jury in April 2019. Before the trial court ordered the jury to deliberate, it directed a verdict for McLane on its claim for breach of the Agreed Injunction. The jury returned a verdict for McLane, making specific findings that (1) Leavitt failed to comply with the Separation Agreement, (2) Leavitt failed to comply with the Settlement Agreement, (3) McLane suffered $1,682,000 in damages as a result of Leavitt's failures to comply with the Separation Agreement, Settlement Agreement, and Agreed Injunction, and (4) a reasonable fee for the necessary services of McLane's attorneys in the instant suit is $181,000. The trial court rendered judgment per the jury's findings and denied Leavitt's motion for new trial. Leavitt then perfected this appeal.

## DISCUSSION

In his first issue, Leavitt contends that the trial court erred in directing a verdict on McLane's contempt claim because "no independent cause of action for civil contempt exists under Texas law." *See Galtex Prop. Invs., Inc. v. City of Galveston*, 113 S.W.3d 922, 928 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("The law is well established in Texas that a court may not award a civil judgment to a private litigant in a contempt proceeding."). However, Leavitt's framing of this issue is erroneous because the trial court did not direct a verdict on McLane's contempt claim but rather on its claim for breach of the Agreed Injunction, as

4

reflected in the jury charge's Question Number Three: "You are instructed that Peter Leavitt failed to comply with the Injunction [c]ontained in the Agreed Final Judgment and Injunction."[4] Because Leavitt's asserted error does not correspond to any action the trial court actually took, he presents nothing by this issue for our review. Accordingly, we overrule Leavitt's first issue.

In his second issue, Leavitt contends that the trial court erred in not determining that McLane's claims were barred by res judicata. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996) ("Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action."). Res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Id.* Leavitt argues that the doctrine applies because the contempt order is a final judgment on the merits; the contempt proceeding involved the identical parties as those involved in this action; and this action is based on the same claims, facts, and subject matter as those that formed the basis of the contempt proceeding.

Res judicata bars a subsequent suit only "if it arises out of the same subject matter of a previous suit and . . . through the exercise of diligence . . . *could have been litigated in a prior suit*." *Barr v. Resolution Tr. Corp.*, 837 S.W.2d 627, 631 (Tex. 1992) (emphasis added). Leavitt's argument is premised on the notion that McLane could have brought its claims for breach of the three agreements within the context of the contempt proceeding because those

_____

[4] The question continued, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate McLane for its damages, if any, that resulted from the failure to comply with the Injunction and any failures to comply that you have found in Question Nos. 1 or 2 [asking, respectively, whether Leavitt failed to comply with (1) the Release and Separation Agreement and (2) the Settlement Agreement]?"

5

claims are based on the "same alleged actions forming the basis of the contempt order," i.e., Leavitt's April 2012 communications with the Circle K executive. But as a matter of law McLane could not have brought its breach-of-contract claims in the contempt proceeding. *See Galtex*, 113 S.W.3d at 928 (noting that plaintiff "may be entitled to recover the civil penalties contemplated by the agreed order," but that it could not obtain such judgment through contempt proceedings, and trial court's award of judgment in favor of plaintiff through contempt proceeding was reversible error); *Smith v. Smith*, 130 S.W.2d 1096, 1098 (Tex. App.—Beaumont 1939, writ dism'd) (noting that remedy of contempt for violation of injunction is "merely cumulative of [party's] right to sue for the damages flowing out of the wrong committed by [defendant] subsequent to the entry of" permanent injunction); *see also Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 754 (Tex. 1988) (per curiam) ("This court has earlier held that in a contempt proceeding a private party cannot recover damages for a violation of a court order."); *Green Oaks, Ltd. v. Cannan*, 749 S.W.2d 128, 131 (Tex. App.—San Antonio 1987) ("It is true that a court may punish a contempt by fine or imprisonment in order to vindicate its authority. But in addition, a litigant injured by a contempt may file a civil suit for damages." (citations omitted)), *writ denied per curiam*, 758 S.W.2d 753 (Tex. 1988).

Furthermore, when McLane filed its verified motion to hold Leavitt in contempt of the Agreed Injunction, the trial court's plenary power over that lawsuit had long expired. While the trial court retained inherent authority to enforce its injunction through contempt, such authority did not extend to exercising jurisdiction over *new* breach-of-contract claims arising from Leavitt's actions occurring after the court's plenary power had expired. *See In re McCrum*, No. 04-14-00047-CR, 2014 WL 783445, at *3 (Tex. App.—San Antonio Feb. 26, 2014, orig. proceeding) (mem. op.) (noting that there are "limited circumstances in which a trial court may

6

act long after a final judgment has been signed," including trial court's authority to enforce injunctions by contempt or modify permanent injunctions upon showing of changed conditions); *see also Ex parte Pryor*, 800 S.W.2d 511, 512 (Tex. 1990) ("The power to punish for contempt is an inherent power of a court and an essential element of judicial independence and authority."). Therefore, it follows that, for res judicata purposes, a contempt proceeding—constituting a means by which a court enforces its judgment rendered in a legal action that was based on a particular nucleus of operative facts—cannot itself operate as a new legal action based on a different nucleus of operative facts. *Cf. Xitronix Corp. v. KLA-Tenor Corp.*, No. 03-12-00206-CV, 2014 WL 3893082, at \*3 (Tex. App.—Austin Aug. 7, 2014, pet. denied) (mem. op.) (noting that Texas courts apply "transactional test" to determine whether two actions involve "same claims" and explaining that cases arise from same transaction if they are based on "same nucleus of operative facts"). In sum, McLane could not have brought its breach-of-contract claims in the contempt proceeding, and the claims here are not the same as those at issue in the prior lawsuit. Thus, McLane's claims are not barred by res judicata, and we overrule Leavitt's second issue.

In his third issue, Leavitt contends that the trial court erred by "commenting on the weight of the evidence" when it instructed the jury in Question Number Three, per its directed verdict, that Leavitt "failed to comply with the [Agreed] Injunction."[5] He argues that the instruction was "prejudicial and harmful" because it "suggested to the jury that Mr. Leavitt

---

[5] In his brief, Leavitt does not challenge the propriety of the directed verdict itself but merely the alleged erroneous jury charge. Charge error and directed-verdict error are two separate issues triggered by separate judicial rulings and reviewed under separate standards of review. *See Salazar v. Sanders*, 440 S.W.3d 863, 873–74 (Tex. App.—El Paso 2013, pet. denied). We accordingly do not address the propriety of the directed verdict, and we review Leavitt's assertion that the charge constituted an improper comment on the weight of the evidence for an abuse of discretion. *See Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 158 (Tex. App.—Austin 2017, pet. denied) (explaining that appellate courts review complaints of jury-charge error for abuse of discretion).

[also] failed to comply in Question 1 and 2 of the charge [which questions asked whether Leavitt failed to comply with the Release and Separation Agreement and the Settlement Agreement, respectively].” We disagree.

“[W]hen under the evidence produced upon a trial by jury, a party is entitled to a verdict as a matter of law, the court may and should instruct the jury as to the verdict it must return.” *Homme v. Varing*, 852 S.W.2d 74, 77 (Tex. App.—Beaumont 1993, no writ); *see also Field v. AIM Mgmt. Grp., Inc.*, 845 S.W.2d 469, 473 (Tex. App.—Houston [14th Dist.] 1993, no writ) (“A directed verdict is a legal determination which establishes an issue as a matter of law.”). Texas Rule of Civil Procedure 278 requires the submission of jury questions that are supported by the written pleadings and the evidence, Tex. R. Civ. P. 278, and an instruction is proper if it: (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence, *Natural Soda LLC v. Bunnett & Co., Inc.*, No. 13-17-00558-CV, 2020 WL 1951454, at *14 (Tex. App.—Corpus Christi–Edinburg Apr. 23, 2020, pet. filed) (mem. op.) (citing *Union Pac. R.R. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002)). Only disputed issues of fact must be submitted to the jury. *Triplex Commc’ns, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995). The evidence conclusively established that Leavitt breached the Agreed Injunction, evidenced by the contempt order. Thus, the trial court’s instruction that Leavitt failed to comply with the Agreed Injunction was not an improper comment but rather a necessary instruction because it constituted the predicate to the remainder of the instruction in Question Number Three, asking the jury to determine the amount of damages, if any, to which McLane was entitled due to Leavitt’s failure to comply with the Agreed Injunction.

Furthermore, to constitute a comment on the weight of the evidence, an instruction must be worded so as to indicate the opinion of the trial judge as to the veracity or

8

accuracy of the facts in inquiry. *See McDonald Transit, Inc. v. Moore*, 565 S.W.2d 43, 45 (Tex. 1978); *see also* Tex. R. Civ. P. 277 ("The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers, but the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers when it is properly a part of an instruction or definition."). The instruction that Leavitt failed to comply with the Agreed Injunction did not directly or indirectly indicate the trial judge's opinion about any of the facts *in inquiry*—i.e., whether Leavitt also failed to comply with either of the other two agreements at issue or whether McLane suffered damages as a result. The trial court's instruction in Question Number Three informing the jury that Leavitt failed to comply with the Agreed Injunction was therefore proper and did not constitute an abuse of discretion. Accordingly, we overrule Leavitt's third issue.

In his fourth issue, Leavitt contends that the trial court abused its discretion in admitting evidence of the contempt proceeding, including a copy of the contempt order. We uphold a trial court's admission or exclusion of evidence unless (1) there was no legitimate basis for the court's ruling, and (2) the error probably caused the rendition of an improper judgment. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). We sustain an admission or exclusion of evidence if it is correct under any applicable legal theory. *Id.*

Leavitt argues that the challenged evidence "was prejudicial and misleading to the jury as they were being asked to consider breaches of contract that were related to the same injunction Leavitt was found to have violated." He claims that the prejudicial effect of the challenged evidence "outweighed any benefit it could have had to the jury's determination of the breach of contract issues at hand." *See* Tex. R. Evid. 403 (allowing trial court to exclude

9

relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice [or] misleading the jury"). Leavitt's argument on this issue rests on the premise that the only agreements at issue at trial were the Separation Agreement and Settlement Agreement because the Agreed Injunction was not enforceable as a contract but merely as a judgment. However, the following provision in the Agreed Injunction explicitly belies this contention: "This Agreed Final Judgment and Injunction is also a contract between [McLane] and [Leavitt]." *See Yazdchi v. State*, No. 14-04-00500-CV, 2005 WL 2149416, at *3 (Tex. App.—Houston [14th Dist.] Sept. 8, 2005, pet. denied) (mem. op.) (noting that agreed judgments are contracts between parties and may be enforced through claims for breach of contract). Because the issue of whether Leavitt breached the Agreed Injunction was expressly at issue at trial, it follows that evidence of the contempt proceeding—which proceeding tried the very issue of breach of the Agreed Injunction—was directly relevant and thus admissible unless provided otherwise by law. *See* Tex. R. Evid. 401 (defining relevant evidence as that having "any tendency to make a fact more or less probable than it would be without the evidence [if] the fact is of consequence in determining the action"), 402 (making relevant evidence admissible unless provided otherwise by constitutional or statutory law or applicable rules).

Leavitt further argues that evidence of the contempt proceeding was "prejudicial," "misleading," and "confusing" to the jury because the evidence likely influenced the jury's findings on whether Leavitt breached the other two agreements at issue (i.e., the Release and Separation Agreement and the Settlement Agreement). However, testimony is not inadmissible "on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018). Rather, "unfair prejudice is the proper

10

inquiry," which means in this context "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* We fail to see how evidence of the contempt proceeding—which tended to make more probable the fact that Leavitt violated the Agreed Injunction—created an undue tendency to suggest to the jury that it make findings on the other issues before it on any improper basis. On this record, we cannot conclude that there was no legitimate basis for the trial court's admission of evidence of the contempt proceeding. Accordingly, the trial court did not abuse its discretion in admitting the challenged evidence. We overrule Leavitt's fourth issue.

In his final issue, Leavitt complains that the evidence was insufficient to support the jury's findings concerning breach, causation, and damages, as reflected in the jury's answers to Questions One through Three. Question One asked, "After January 5, 2012 [the date the Agreed Injunction was entered], did Peter Leavitt fail to comply with the Release and Separation Agreement?" Question Two asked, "Did Peter Leavitt fail to comply with the Settlement Agreement?" The jury answered "Yes" to both. Under the notation "Question Three" the charge continued,

> You are instructed that Peter Leavitt failed to comply with the Injunction [c]ontained in the Agreed Final Judgment and Injunction.
>
> What sum of money, if any, would fairly and reasonably compensate McLane for its damages, if any, that resulted from the failure to comply with the Injunction and any failures to comply that you have found in Question Nos. 1 or 2?
>
> . . .
>
> Answer: [$]1,682,000.00

We begin by reviewing the sufficiency of the evidence supporting the jury's answer to the third question because our conclusion as to that is dispositive of Leavitt's

11

complaints about the first two questions. Leavitt first contends that there was "no evidence" to support the jury's answer because McLane presented no evidence showing that Leavitt's actions caused any damages. He specifically argues that no Circle K representative testified that Leavitt's actions caused Circle K to decide to bring the arbitration claim against McLane and that, therefore, there is "no showing of causal damages stemming from the breach of contract." We consider this argument to be challenging the legal sufficiency of the evidence supporting the jury's finding on causation.

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which the opposing party had the burden of proof, the appellant must demonstrate that there is no evidence, or merely a scintilla of evidence, to support the adverse finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Anything more than a scintilla is legally sufficient to support a challenged finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 48 (Tex. 1998). To meet this standard, the evidence must rise to a level that "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. When reviewing a finding for legal sufficiency, the reviewing court considers the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Id.*

To establish liability for damages in a breach-of-contract suit, the plaintiff must show that the defendant's breach was a substantial factor in causing the injury. *Tamimi Glob. Co. v. Kellogg Brown & Root, L.L.C.*, 483 S.W.3d 678, 705 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773, 796 (Tex. App.—Dallas 1992, writ denied). Actual damages are recoverable for a breach of contract if

12

the plaintiff shows that the injury complained of was the natural, probable, and foreseeable consequence of the defendant's breach. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981).

While Leavitt is correct that no Circle K representative testified as to how or why Circle K made the decision to file its arbitration demand, and there is no other direct evidence establishing a causal link between Leavitt's actions and Circle K's arbitration demand, McLane was entitled to rely on circumstantial evidence to prove causation. *See Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). "By its very nature, circumstantial evidence often involves linking what may be apparently insignificant and unrelated events to establish a pattern." *Id.* at 927. "Thus, each piece of circumstantial evidence must be viewed not in isolation, but in light of all the known circumstances." *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001). Our review of the record reveals more than a scintilla of circumstantial evidence supporting causation—i.e., that Leavitt's breach of the Agreed Injunction was a substantial factor in Circle K's decision to demand arbitration and that the attorney's fees McLane incurred in the arbitration were the natural, probable, and foreseeable consequence of Leavitt's breach.

We begin our review of the evidence with the April 9, 2012 email that Leavitt sent Brian Hannasch, the President and COO of Circle K (the Hannasch email). In the email, on which McLane heavily relied at trial, Leavitt wrote,

> Brian,
>
> It was good to speak with you today as it has been [a] while since we last spoke. I want you to know that it has been a pleasure to work with your company. Rod has been a true professional and is a credit to your organization. *I have thought about your questions and think that there is a reason to pursue your claim with McLane.* While I recognize that you may not want to battle it out with them any more than you already have done so, my thoughts are that it may be advantageous

13

for Couche Tard [Circle K's parent company] to at least present McLane with a number for the cig reconciliation plus the OTP monies and whether you choose to pursue or not is your business, but as you indicated, it is inevitable that CT [Couche Tard] will acquire retailers who are serviced by McLane. It may be a good strategy to have already presented to McLane a number that you expect from them.

Thank you for your consideration in these opportunities. I look forward to connecting with you in the future.

(Emphasis added.) Leavitt testified that he had spoken by phone with Hannasch earlier that day, during which conversation Hannasch asked him some "questions about McLane." While Leavitt did not specify what, exactly, those questions were, he admitted that by sending the Hannasch email, he was "providing advice regarding Circle K's business dealings with McLane" and that his reference to "pursuing your claim with McLane" meant that Circle K "should pursue an audit against" McLane. Leavitt further testified that Hannasch said the April 9, 2012 communication with Leavitt "was a factor in Circle K's decision to move forward with the audit."[6] Leavitt also testified that he remembered "part" of his April 9 phone conversation with Hannasch in which Leavitt recommended not "fight[ing] with McLane" and that the two parties simply "get together and resolve the issue." However, on the witness stand Leavitt was impeached by his testimony from the contempt hearing during which he testified that he remembered "nothing" about the Hannasch conversation. As specifically recited in the contempt order and found by the trial court on directed verdict, the Hannasch email constituted a breach of the Agreed Injunction.[7]

---

[6] It is not clear from the record when or in what context Hannasch allegedly made this statement, and Hannasch did not testify at trial.

[7] The contempt order reads, "Peter Leavitt is in contempt for violation of . . . the Agreed Final Judgment and Injunction . . . for advising the President and Chief Operating Officer of Circle K to pursue a claim against McLane Company, Inc., in the April 9, 2012 e-mail."

14

Only seven weeks later, on May 31, 2012, Circle K representative Rod Smith sent an email to McLane representative Kevin Koch, stating that Circle K "would like to resume the audit process" of the DSA "that was delayed due to the various legal issues in 2010 and 2011" and that consulting company Ernest & Young was "willing to conduct the audit." The next day, Koch responded to Smith's email indicating that he was "somewhat surprised" to receive Smith's email because his "correspondence file . . . indicates that we had not communicated regarding this topic since my letter to you dated July 26, 2011 in response to your email to me of July 15, 2011." Koch's email continued, stating that—while McLane was "still very much willing to proceed" with the audit with the assistance of Ernst & Young—such audit needed to be "consistent with our requests as previously outlined in" correspondence from November and December 2010 and July 2011. Koch summarized those prior requests as the requirement that

> Circle K assist us in completing our "risk assessment" regarding the secret unauthorized release of McLane related financial data that we believe has been disseminated to . . . Peter Leavitt and/or his agents or perhaps other persons not properly disclosed to McLane. Our extensive discovery efforts have led us to learn that data was disseminated to Mr. Leavitt and/or his agents utilizing multiple formats which include but are not necessarily limited to, USB devices, CD's, DVD's, electronic transmission, and hard copies contained in one or more notebooks.

Koch's email concluded by conditioning the audit on Circle K's completion of the "risk assessment" requested by McLane: "When we have a full accounting of this information we can set up a meeting to kick off the contract compliance review [i.e., audit]." Instead of complying with McLane's request, Circle K filed its demand for arbitration with the AAA a few months later on November 19, 2012.

As indicated by Koch's email and other evidence, Leavitt did not send the Hannasch email in a vacuum but rather on the heels and within the context of a long,

15

complicated, and discordant relationship between McLane and Circle K concerning Leavitt's work with Circle K in its efforts to conduct an audit under the DSA. First, in late 2006, Leavitt negotiated the DSA with Circle K executives, including Hannasch, and executed it on behalf of McLane. Having negotiated and signed the DSA, Leavitt was aware that it contained a broad arbitration clause requiring all disputes to be arbitrated through the AAA. Leavitt testified that the DSA was a "significant deal for both parties" and "worth hundreds of millions of dollars." Just a little over a year after Leavitt negotiated and executed the DSA on behalf of McLane, he was terminated from McLane's employment for "insubordination," McLane's Executive Vice President of Administration, Jim Kent, testified. Shortly after leaving McLane, Leavitt began a consulting business to "assist retailers negotiate contracts with distributors." His work expanded over time to include consulting for wholesalers and assisting retailers with audits of their distributors, and he engaged other former McLane employees to assist him in his "contract audit offering[s]."

In late August 2009, Leavitt contracted with Circle K to provide "contract compliance audit services related to" the very DSA he had negotiated and executed on behalf of McLane. Leavitt's agreement with Circle K provided that his firm would be compensated on a contingency basis with different tiers of compensation based on the amount that Circle K recovered from McLane as a result of the audit. Within just two weeks of engaging Leavitt's services, Circle K sent McLane a letter—the substantive portions of which Leavitt drafted— informing McLane that, as part of its "overall quality improvement process," Circle K had "implemented a Contract Compliance Assurance Program with key suppliers," and that McLane had been "selected for a contract compliance review." The letter noted that Circle K "has contracted the services of SVG Advisors to perform the review" of the parties' "contractual

16

relationship" and "expressly consents to the release and divulging by McLane of all its contract commercial terms and other relevant information regarding our agreements . . . necessary for SVG Advisors to perform its review." The letter contained a bulleted list of numerous specific categories of data and documentation requested. It further stated that the audit specialists would use "generally accepted review sampling and extrapolation techniques to determine the accuracy of all invoices and the value of any contract variances"; that "variances resulting from review of the invoice statistical sample will be extrapolated over the total invoice population for the review period"; and that "should errors be found in the sample, payment will be expected for the extrapolated amount."

Friction between Circle K and McLane quickly ensued, as evidenced by a September 15, 2009 response letter from Don Graves, McLane's Vice President and Controller of Grocery Distribution. Graves wrote, "I am initially confused by the [data] request in light of the existing audit of McLane that Circle K has been engaged in since last November," through which McLane had "already provided . . . much of the same data as . . . [sought] here. Having two separate, similar, simultaneous reviews seems inappropriate. And repeating extensive data collection efforts that have already been provided for you is not a constructive use of my team's resources." Furthermore, Graves wrote, "[n]othing in the DSA's applicable provisions calls for the extensive electronic file you have requested. Indeed, whether unintentional or by design, the breadth of data your letter seeks is staggering . . . [and] represents more than 10 million lines of data."

Graves suggested an alternate "methodology" to share McLane's data for purposes of the audit but cautioned that "[w]hether we follow this [alternate] process or another . . . the broad scope outlined in your letter is unworkable" and that "before McLane can agree to honor

17

the results of any 'extrapolation' procedure" as requested by Circle K, McLane would need to "satisfy" itself that the procedure "represents a statistically valid procedure." Graves, having "dealt with dozens of major audit firms" in his career, was "unfamiliar with SVG Advisors" and thus requested "some background information" about the firm "as well as the individuals who will be performing the audit. On this note, attached is the Confidentiality Agreement that McLane requires of third party individuals who are granted access to McLane's records and data." Graves's letter concluded, "we do not agree with Circle K's request to view McLane's wholesale programs with cigarette manufacturers. We fail to see its pertinence in a contract pricing compliance review."[8]

Kent testified about McLane's receipt of Circle K's September 9, 2009 "out of the blue" letter requesting "an unusual audit": McLane was "somewhat suspicious" of the request, given that the company was "already being audited by Circle K in different locations," and this request was seeking to use an "outside third party called 'SVG,' which was somebody [McLane] had never heard of," and sought to use "sampling techniques and a variety of different unusual audit procedures that hadn't been used in the past." Kent explained that, while audits themselves are not unusual, typically Circle K and other companies conduct the audits with their own "internal auditors or somebody within the company" rather than outside firms. After Graves sent his letter responding to Circle K's "unusual" audit request, McLane requested a meeting in Houston to "meet the SVG people" so that McLane could determine if SVG "really had offices, if they were a real company, who the people were." Kent testified that SVG "really didn't have

---

[8] Leavitt testified that shortly before his employment with McLane was terminated, he had learned about a sales-tax "loophole" that McLane had discovered related to cigarettes and OTP (other tobacco products) and that McLane had filed several tax-refund lawsuits in connection therewith. Leavitt testified that he believed McLane's customers were entitled to a portion of the refunds obtained in those lawsuits.

18

offices," had just "rented a space," and had just been formed, and McLane did not feel that SVG was "qualified to do an audit." He said that, towards the end of the meeting with SVG, he learned that Leavitt "was involved" with SVG and "had ended up being part of this overall audit request." Kent testified that McLane was "shocked and surprised" to discover that Leavitt was "conspiring" with Circle K to "work against" McLane and filed its initial lawsuit against Leavitt shortly after the SVG meeting. That lawsuit "lasted for about two years" and was resolved through the Settlement Agreement and Agreed Injunction.

Although he did not attend the SVG meeting, Leavitt described it as "a very ugly meeting" and "very hostile," as reported to him by an SVG representative, partly because McLane had learned about Leavitt's involvement in the audit and then "disallowed" the audit to proceed. Leavitt admitted that, ever since the "ugly" Houston meeting (which occurred in October 2008), he has known that McLane was "taking the position that [the] [S]eparation [A]greement prohibited [him] from engaging or assisting Circle K in an audit of McLane."

Evidence showed that the DSA terminated on September 10, 2011, and that, although McLane and Circle K attempted to negotiate an extension, no agreement was reached. Kent testified that Circle K's May 31, 2012 email seeking to pursue its latent audit request was "out of the blue" because McLane believed that the legal proceedings involving Circle K "had been resolved"; that Circle K's audit rights had terminated upon the DSA's termination, thus "completely separat[ing]" the two parties' relationship; and that Circle K had "never ended up resolving the issues of taking [McLane's] confidential information and giving it to a bunch of miscellaneous people with SVG."

In the arbitration proceeding, the arbitrator issued a partial final award on April 2, 2015 on the sole issue of whether Circle K was entitled to an audit, reserving all other "disputes

and controversies" (including an award of attorney's fees) for a final hearing. The partial final award recited that Circle K's request for an audit under the DSA was denied because the "Doctrine of Unclean Hands [is] dispositive" of Circle K's rights to an audit. Among the factual recitations in the arbitration partial final award were the following:

- Sometime prior to August 2009, McLane "received anonymous phone calls informing [it] that Leavitt was in contact with [Circle K]. Neither party confronted the other as to whether Leavitt was acting on behalf of [Circle K] until August 2009. After questioning by [McLane], [Circle K] disclosed . . . that Leavitt was working for [Circle K]." McLane "instructed [Circle K] not to use Leavitt or his entities, directly or indirectly, in any work . . . in connection with the audit of [McLane]." Nonetheless, Circle K made "continued requests for the audit," and McLane "continued to express concern about Leavitt's involvement and the disclosures of confidential data by Leavitt and [Circle K] to third parties."

- "The disclosures of [McLane]'s confidential data continued to be the major concern discussed between the Parties through the termination date of the DSA."

- McLane "conditioned an audit on [Circle K] disclosing the identity of third parties receiving [McLane]'s confidential data. [McLane] never received any disclosure of data by [Circle K]. [Circle K] conditioned releasing data on a release and hold harmless agreement by [McLane]. The release was not given and the data was never provided, and therefore, the audit was never conducted."

- Circle K "could have questioned [McLane] directly about Leavitt's involvement concerning [McLane's confidential affairs but] . . . chose not to do so and accepted Leavitt's representation that no problem existed."

- Circle K's "top management approved the use of Leavitt's services, and was made aware of the effort to keep Leavitt's identity a secret from the Respondent."

- "*The continuing presence or influence of Leavitt so affected the Parties' relationship that terms for the audit were not reached. When [McLane] asked [Circle K] to discontinue any involvement of Leavitt, he continued in the background and influenced [Circle K] and its representatives.*"

(Emphasis added.)

20

In light of all the events leading up to the Hannasch email, and in the context of the strained relationships among the parties—especially their respective opposite positions about audit rights and procedures—as well as Leavitt's awareness of such context, the jury could reasonably have concluded that Leavitt's advising Circle K to "pursue its audit claim" was a substantial factor in bringing about Circle K's arbitration demand and the resulting arbitration proceeding and that such proceeding and McLane's incurring of legal fees were the natural, probable, and foreseeable consequences of Leavitt's so advising Circle K. The following evidence supports such reasonable conclusion by the jury: Leavitt's close involvement with and fashioning of Circle K's audit requests from the very beginning; Leavitt's intimate familiarity with McLane's business and the DSA as well as his personal animosity towards McLane executives and his belief that the company was improperly retaining tax refunds that should have been shared with its customers; Leavitt's awareness of the nonnegotiable conditions McLane placed on its willingness to allow an audit and Circle K's refusal to agree to such conditions; the span of nearly three years during which Circle K and McLane had sporadic communications about the audit, during which time Leavitt continued to closely advise Circle K and McLane steadfastly refused to allow an audit; and Leavitt's advising Circle K to pursue its audit claim—and Circle K doing so on the heels of that advice—nearly a year after Circle K and McLane had last communicated about the audit, even though the DSA had terminated and Circle K was well aware of McLane's nonnegotiable conditions for the requested audit. Because there is more than a scintilla of evidence to support the jury's finding that Leavitt's breach of the Agreed Injunction was a substantial factor in bringing about the damages that McLane suffered in the form of its attorney's fees incurred in defending itself in the arbitration, we conclude that the evidence is legally sufficient to support the jury's finding on causation.

21

As to the amount of damages, Leavitt argues that the jury's award of $1,682,000 is "against the great weight and preponderance of the evidence" because McLane has been "made whole" and "satisfied for the [attorney's] fees" it incurred in the Circle K arbitration in that it was awarded $700,000 in attorney's fees in the final arbitration award. He argues that "awarding additional damages to McLane against Leavitt is excessive and not supported by the evidence" because it would constitute a "double recovery," which is barred by the one-satisfaction rule. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) ("The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury."). He asks this Court to suggest a remittitur because the jury's award of $1,682,000 in damages is "grossly excessive."[9] *See Pope v. Moore*, 711 S.W.2d 622, 623–24 (Tex. 1986) (noting that "proper remittitur standard is factual sufficiency"); *Williams v. Crawford*, No. 03-16-00696, 2018 WL 1124306, at *10 (Tex. App.—Austin Mar. 2, 2018, no pet.) (mem. op.) (appellate court will suggest remittitur only if evidence for damages award is so "factually insufficient or against the great weight and preponderance of the evidence as to be manifestly unjust" (citations omitted)).

Leavitt's argument fails for two reasons. First, as reflected in Circle K's arbitration demand and the partial and final awards, the arbitration was in the nature of a declaratory-judgment action—Circle K urged that the DSA entitled it to conduct an audit, and McLane responded that the DSA did not authorize an audit for various reasons, including the doctrine of unclean hands. The only "injury" for which McLane sought relief in that proceeding was the injury it was likely to suffer if Circle K prevailed in the arbitration—i.e., the costs

---

[9] In response to Question Number Four, the jury awarded McLane $181,000 in attorney's fees incurred in the instant lawsuit, and Leavitt does not challenge that award (or the trial court's judgment rendered thereon) on appeal.

associated with facilitating an audit and any net deficiencies it would have owed Circle K if discovered in an audit. This is an injury distinct from the injury at issue here, and the $700,000 attorney's fees awarded to McLane in the arbitration final award did not constitute actual damages but merely the arbitrator's determination that McLane was entitled to that amount as "equitable and just" attorney's fees pursuant to applicable AAA rules and the Uniform Declaratory Judgments Act. *See* Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). Such award comports with the general rule that attorney's fees incurred to defend or prosecute an action are not recoverable in that same action as actual damages. *See Haubold v. Medical Carbon Rsch. Inst., LLC*, No. 03-11-00115-CV, 2014 WL 1018008, at \*6–8 (Tex. App.—Austin Mar. 14, 2014, no pet.) (mem. op.).

However, attorney's fees incurred in a prior action may be recovered as damages when they are the natural, probable, and foreseeable consequence of a defendant's breach of a contract, such as a settlement agreement, that necessitated defending or prosecuting such breach. *See id.* (citing *In re Nalle Plastics Fam. Ltd. P'ship*, 406 S.W.3d 168, 174–75 (Tex. 2013) (orig. proceeding)); *Ganske v. WRS Grp., Inc.*, No. 10-06-00050-CV, 2007 WL 1147357, at \*12 (Tex. App.—Waco Apr. 18, 2007, no pet.) (mem. op.). Therefore, McLane's seeking in this lawsuit its damages incurred in the arbitration proceeding—in the form of attorney's fees—is an attempt to recover for an injury separate from that in the arbitration, to which the one-satisfaction rule does not apply. *See Stewart Title*, 822 S.W.2d at 7; *see also McCullough v. Scarborough, Medlin & Assocs.*, 435 S.W.3d 871, 905 (Tex. App.—Dallas 2014, pet. denied) (in action for breach of fiduciary duty, noting that equitable disgorgement and actual damages "are intended to address

separate and distinct injuries," and thus one-satisfaction rule "does not preclude the recovery of both").

Secondly, McLane presented extensive evidence of the attorney's fees and costs it incurred in the arbitration proceeding, totaling over $2,448,000—an amount well in excess of the $700,000 it was awarded in the arbitration. Its evidence included itemized invoices from the law firms representing McLane in the arbitration as well as expert testimony from its counsel explaining why the fees and costs were reasonable and necessary. Leavitt did not introduce any expert testimony challenging the reasonableness or necessity of McLane's attorney's fees. Subtracting the $700,000 in attorney's fees that McLane was awarded in the arbitration from the total fees it incurred leaves a balance of over $1,748,000 in out-of-pocket damages for which McLane had not been compensated. The jury's award of $1,682,000 was less than that amount and, therefore, supported by legally and factually sufficient evidence. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (noting that jury generally has discretion to award damages within range of evidence presented at trial).

We thus conclude that the evidence was legally and factually sufficient to support the jury's award of damages. Because we so conclude, we need not address Leavitt's complaints that the evidence was legally insufficient to support the jury's answers to Questions One and Two—asking whether Leavitt breached the Release and Separation Agreement and Settlement Agreement, respectively—because Leavitt's breach of the Agreed Injunction alone supports the jury's findings on causation and damages. The only evidence of actions Leavitt took after January 5, 2012—the date specifically mentioned in Question Number One pertaining to the Release and Separation Agreement and the date of the Settlement Agreement's execution—was the Hannasch email and conversation. Whether such actions constituted a breach of only the

24

Agreed Injunction or also of one or both of the other two agreements, McLane suffered only one injury for those actions: the attorney's fees it incurred in the arbitration. Therefore, even if the jury's findings as to Questions One and Two are erroneous, such error is harmless because it did not probably cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1. Accordingly, we overrule Leavitt's fifth issue.

## CONCLUSION

Having overruled each of Leavitt's issues, we affirm the trial court's final judgment.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed

Filed: April 29, 2021